# IN THE COURT OF APPEALS OF IOWA

No. 22-0210
Filed April 27, 2022

**IN THE INTEREST OF S.O.,**
**Minor Child,**

**K.O., Mother,**
 Appellant,

**J.H. Jr., Father,**
 Appellant.

_____

Appeal from the Iowa District Court for Worth County, Adam D. Sauer,
District Associate Judge.

A mother and father separately appeal the termination of their parental
rights to one child. **AFFIRMED ON BOTH APPEALS.**

Richard N. Tompkins, Jr. of Tompkins Law Office, Mason City, for appellant
mother.

Cameron M. Sprecher, Mason City, for appellant father.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant
Attorney General, for appellee State.

Becky E. Wilson, Mason City, attorney and guardian ad litem for minor child.

Considered by Bower, C.J., and Vaitheswaran and Chicchelly, JJ.

**CHICCHELLY, Judge.**

A mother and father separately appeal the termination of their parental rights to one child, S.O.  The mother K.O. argues there were not reasonable efforts made at reunification.  The father J.H. Jr. argues the required removal timeline before termination was not satisfied, the child could have been returned to his custody, and, in the alternative, there should have been a six-month extension.  Both argue termination was not in the child's best interests and would be detrimental to the child.  Upon our de novo review, we affirm termination of each parties' parental rights.

## I.  *Background Facts & Proceedings.*

The child in question is less than four years old and was first removed from her mother's care in September 2018.  At that time, the mother and her paramour J.V. were arrested while S.O. was in the vehicle.  The mother was arrested for possession of paraphernalia and possession of methamphetamine, and she was later charged with operating while intoxicated (OWI) in connection with the incident.  She admitted to smoking marijuana that day and using methamphetamine a few days prior to the arrest.  Pursuant to a safety plan, the Department of Human Services (DHS) placed the child with her maternal grandmother with the stipulation that she would not have unsupervised contact with K.O.  However, DHS removed S.O. less than one month later due to the child not being made available to providers and being around known drug users, including an unsupervised visit to Colorado with K.O. and J.V.

A petition for termination of parental rights was filed against K.O. in May 2019.  The court dismissed the petition in July 2019 due to K.O. making positive

steps toward reunification. DHS returned S.O. to her mother's care in October 2019. After K.O. relapsed, S.O. was removed again in April 2020. DHS returned S.O. to her mother's care in August 2020. In November 2020, the mother self-reported to DHS that she was feeling mentally unstable. Pursuant to a safety plan, S.O. was placed in the care of her maternal grandfather, and K.O. was not to have unsupervised contact with the child. After a few weeks, DHS learned that unsupervised contact had occurred. As a result, S.O. was removed in December 2020. Since then, she has not returned to her mother's care.

The mother has battled substance abuse for several years now. Throughout the life of this case, she no-showed for drug testing on at least twenty-one occasions. She provided six positive drug tests between September 2018 and October 2021. She either refused or did not cooperate with a hair stat test on four occasions from March 2019 to April 2020. She provided several drug tests that returned as non-human urine. She lost a drug patch in May 2020 and removed one in November 2020. She has provided nine negative samples during the course of this case. The mother began outpatient substance-abuse treatment services in the fall of 2018, but the provider discharged her in March 2019 due to attendance policy violations. K.O. participated in treatment again around the time of the first petition for the termination of parental rights in the summer of 2019. However, she was discharged in July 2020 due to an outstanding bill—she needed to set up a payment plan and pay $1 to continue treatment. After K.O. was arrested for drug charges in April 2021, she began inpatient substance-abuse treatment for the first time. The provider discharged her the following month for having a vape in her purse following a visit by her paramour. She continued to participate in

outpatient services until she started inpatient treatment again in November 2021. After only a few days, the facility asked her to leave due to close contact with her mother, who tested positive for COVID-19. K.O. returned to inpatient treatment two days before the juvenile court's hearing on this petition in December 2021.

DHS became aware that J.H. Jr. was a potential father in the summer of 2020 while he was in the Cerro Gordo County Jail. He had been living out of state for the first couple of years of S.O.'s life after K.O. allegedly told him that he was not the child's father. Paternity testing confirmed he is S.O.'s biological father in October 2020. After his release from jail in late 2020, J.H. Jr. progressed quickly from supervised visits with S.O. to unsupervised overnight and multiple day visits. He also participated in the SafeCare Curriculum and voluntarily signed up for classes through community action. The DHS caseworker testified that J.H. Jr. took criticism well and spent a lot of time on his own learning about how to care for a young girl and manage behaviors and discipline. He and S.O. developed a bond, and the caseworker testified, "Anywhere [the father] was at in the house, there would be [S.O.] right next to him. Leaving was a struggle . . . because [S.O.] did not want to go."

DHS scheduled to place S.O. in her father's care on June 16, 2021. However, on June 14th, he was ordered to serve thirty days in jail and was made aware of a warrant for his arrest on a new charge. Rather than turn himself in, J.H. Jr. panicked—he took his cousin's truck and crashed it. As a result, he was charged with OWI and burglary, as well as violation of his parole. Since J.H. Jr. was in jail, DHS placed S.O. in the home where her paternal grandfather, paternal great-grandfather and her father's paramour all resided on June 16th. When it

became clear that S.O. was not going to be in the custody and care of her father directly, DHS requested and was granted custody in August 2021.

J.H. Jr. entered into a plea agreement in August 2021 and was sentenced to serve up to fifteen years in prison. He is serving time for two OWIs, possession of marijuana, and third-degree burglary. J.H. Jr. completed an initial drug test with DHS in March 2021 and a hair stat test in May 2021—both were negative. He was also providing daily breath testing to his probation officer and had one positive result in April 2021. While eligible for parole after eighteen to twenty-four months, he does not have an expected release date. He has stayed in contact with S.O. through video visits to the extent possible in prison. While DHS has custody, S.O. remains in the home of her paternal grandfather, in whose care she has developed a bond with her half-sibling and cousins.

The State petitioned for termination of both K.O. and J.H. Jr.'s parental rights in September 2021. During the hearing in December, the child's guardian ad litem testified in support of terminating the mother's parental rights but recommended against terminating the father's rights. She stated, "He shows every sign of being able to be a successful parent." The juvenile court granted the petition as to both parents, and it now comes before us on appeal.

## II. Review.

Our review of termination proceedings is de novo. *See In re B.H.A*., 938 N.W.2d 227, 232 (Iowa 2020). "We will uphold an order terminating parental rights where there is clear and convincing evidence of the statutory grounds for termination. Evidence is clear and convincing when there is no serious or substantial doubt as to the correctness of the conclusions of law drawn from the

evidence." *In re T.S.*, 868 N.W.2d 425, 431 (Iowa Ct. App. 2015) (citing *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010)).  We give weight to the juvenile court's fact findings, especially those about witness credibility, although they are not binding. *See* Iowa R. App. P. 6.904(3)(g); *In re C.A.V.*, 787 N.W.2d 96, 99 (Iowa Ct. App. 2010).

### III. Discussion.

The principal concern in termination proceedings is the child's best interests.  *In re L.T.*, 924 N.W.2d 521, 526 (Iowa 2019).  Here, the juvenile court found the State proved by clear and convincing evidence that termination of both the mother's and father's parental rights was appropriate under Iowa Code section 232.116(1)(h) (2021).  The court may terminate under this paragraph if it finds:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a [CINA] pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

The fourth element is at issue for both parents: whether the child could be returned to the parent's care at the time of the termination hearing.  *See In re D.W.*, 791 N.W.2d at 707 (interpreting the term "at the present time" to mean "at the time of the termination hearing").  With regard to the father, the third element regarding the removal timeline is also in dispute.

Iowa courts use a three-step analysis to review the termination of parental rights.  *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018).  Those steps include whether:

(1) grounds for termination have been established, (2) termination is in the child's best interests, and (3) we should exercise any of the permissive exceptions to termination. *Id.* at 472–73. We address each step in turn.

*A. Grounds for Termination of Mother's Rights.*

The mother does not argue that S.O. could have actually been returned to her care at the time of the termination hearing. Rather, this element is at issue to the extent that she argues DHS did not make reasonable efforts at reunification. *See* Iowa Code § 232.102(7) (requiring that DHS "make every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child"). Under Iowa law, "the reasonable efforts requirement is not viewed as a strict substantive requirement of termination." *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000). Instead, it shapes the State's burden of proof, as it must establish reasonable efforts were made in connection with proving the child cannot safely be returned to the parents' care. *See id.* Reasonable efforts may include, but are not limited to, finalizing a permanency plan and offering family-centered services. Iowa Code § 232.102(10)(a). In evaluating whether reasonable efforts have been made, our courts consider "the type, duration, and intensity of services or support offered or provided" and the "relative risk to the child of remaining in the child's home versus removal of the child." *Id.* § 232.102(10)(a)(1), (2).

While DHS has offered a variety of services, the mother's participation has been inconsistent and unpromising. K.O. initially declined the opportunity to join Family Treatment Court. After the court dismissed the first petition for the termination of her parental rights, she did join but was discharged in June 2020 for non-compliance. She has not attempted to rejoin Family Treatment Court. DHS

referred her to the Parent Partner Program, but she was discharged for non-participation. She did not complete the SafeCare Curriculum due to a relapse. She participated in mental-health counseling, but she has cancelled or no-showed for six appointments since she began trauma-based therapy in January 2021. She was under court order to attend couples counseling with her paramour—they have attended twice and no-showed on three occasions. She reported to DHS in November 2021 that she was not participating in couples counseling. Altogether, DHS has offered or provided Family Centered Services, Family Team Meetings, a Parent Partner referral, child interactions, individual counseling, couples counseling, substance-abuse treatment services, Family Treatment Court, relative placement, and drug testing.

With regard to the relative risk of remaining in the home, the mother has not demonstrated that she can offer a safe and stable home. Since the most recent removal in December 2020, K.O. has not advanced beyond fully supervised interactions. She is inconsistent with her visits, during which S.O. hits, kicks, and spits at her mother. She has not maintained steady employment or housing. She claimed to work for Burger King, but DHS called to confirm in November 2021 and was told she had not worked there in six or seven months. Depending on the status of their relationship, she may reside with her paramour or with parents or friends. As detailed above, substance abuse has continued to plague her.

Given the risks presented by the mother's lack of stable sobriety, housing, and employment combined with DHS's extensive array of services offered, we find the agency has satisfied its obligation to make reasonable efforts toward reunification. Accordingly, we will not disturb the juvenile court's finding that S.O.

could not be returned to her mother's care at the time of the termination hearing and a statutory ground for termination was established under Iowa Code section 232.116(1)(h).

*B. Grounds for Termination of Father's Rights.*[1]

The father contends that the statutory removal window was not satisfied prior to the State's petition for the termination of his parental rights. *See* Iowa Code § 232.116(1)(h)(3) (requiring the child to have "been removed from the physical custody of the child's parents for at least six months of the last twelve months"). The termination hearing was held on December 22, 2021—more than one year after DHS last removed the child from her mother's care on December 14, 2020. J.H. Jr. was just beginning to participate in services with DHS in late 2020 and unable to accept a primary caretaking role at that time.

However, this subparagraph does not afford a grace period to parents who are absent from their children's lives. *See In re M.S.*, 889 N.W.2d 675, 686 (Iowa Ct. App. 2016) (Danilson, C.J., concurring specially) ("Because the child had been removed from the mother's care for this period of time [and it is undisputed that the child has never been in the custody of the father], the State need not prove the child was removed from the father's home [for purposes of establishing section 232.116(1)(h)(3)]."). There are safeguards in place should a parent's absence warrant an exception. *See* Iowa Code § 232.116(3)(e) (providing discretionary exceptions to termination in the event of a parent's absence for "admission or

---

[1] The father's brief argues that grounds for termination were not proven under Iowa Code section 232.116(1)(f). The juvenile court terminated his rights pursuant to subsection (h), and the father's arguments substantively align with this provision. Therefore, we address only the relevant subsection.

commission to any institution, hospital, or health facility or due to active service in the state or federal armed forces"). S.O. was eventually placed with her father for two months, albeit indirectly while he was incarcerated. Therefore, S.O. was removed for approximately ten of the twelve months preceding the termination hearing, which satisfies the statutory requirement.

The father also argues that the juvenile court should have found S.O. could be returned to his care at the time of the termination hearing. However, J.H. Jr. remains incarcerated with no definitive timeline for parole. Therefore, no opportunity for immediate reunification exists. *See In re S.J.*, 620 N.W.2d 522, 526 (Iowa Ct. App. 2000) (affirming termination of parental rights because child could not be returned to the custody of his incarcerated father); *In re A.C.*, No. 04–0408, 2004 WL 1076077, at *2 (Iowa Ct. App. May 14, 2004) (noting that despite father's upcoming parole hearing, "[t]he children clearly could not be returned to his custody and supervision at the time of the termination hearing or within the reasonably foreseeable future"). Accordingly, we find there is clear and convincing evidence that the child could not be returned to her father's care at the time of the termination hearing. We are unconvinced that a six-month extension would be appropriate given the father's term of incarceration. *See In re A.A.G.*, 708 N.W.2d 85, 92 (Iowa Ct. App. 2005) ("In order to continue placement for six months, the statute requires the court to make a determination the need for removal will no longer exist at the end of the extension.")

Because the requisite removal timeline and inability to be returned were established, we conclude the State adequately established statutory grounds for

termination of the father's parental rights pursuant to Iowa Code section 232.116(1)(h).

*C. Child's Best Interests.*

We next address whether termination of parental rights is in S.O.'s best interests. In doing so, "the court shall give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). Here, the mother has had parental rights terminated to two other children. Her inability to maintain sobriety, unstable housing and employment, and continuation in a relationship leading to mental instability and drug use all combine to support termination again. In fact, "[i]t is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *A.S.,* 906 N.W.2d at 474. The "legislature has established a limited time frame for parents to demonstrate their ability to be parents." *Id.* (citation omitted).

The mother's visits with S.O. have been inconsistent, "chaotic", and demonstrated a weak bond between the child and her mother. In light of her track record, we are unconvinced that K.O.'s parenting ability will improve in the foreseeable future. *See In re A.B.,* 815 N.W.2d 764, 778 (Iowa 2012) ("Insight for the determination of the child's long-range best interests can be gleaned from evidence of the parent's past performance for that performance may be indicative of the quality of the future care that parent is capable of providing.").

Similarly, the father's criminal history and consequent incarceration prevent him from supporting S.O.'s physical, mental, and emotional condition. S.O. has been involved with DHS for the majority of her life, and she deserves a stable, permanent home. The father's argument that he was making progress and could potentially be a successful parent in the future does not negate the fact that he has been largely absent from her life and will continue to be absent for a significant period of time. "Parenting cannot be turned off and on like a spigot. It must be constant, responsible, and reliable." *In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990). Accordingly, we agree with the juvenile court that termination of both the mother's and father's parental rights is in S.O.'s best interests.

*D. Exceptions.*

"Once we have established that the termination of parental rights is in the child['s] best interests, the last step of our analysis is to determine whether any exceptions in section 232.116(3) apply to preclude the termination." *In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016). The mother and father each argue that paragraph (c) applies: "There is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(c).

While K.O. testified regarding the close bond that she feels with her daughter, the record evidence indicates that S.O. shares only a weak bond with her mother. S.O.'s visits with her mother have been described in stark contrast to those with her father. DHS reports that visits are chaotic and that S.O. hits, kicks, and spits at her mother. She has screamed at her, "I hate you, I don't love you, you're not my mom." While S.O. has also said, "I love you" to her mother and cried

when it was time to leave, her overall interactions do not demonstrate a strong bond. S.O.'s time with her mother has been sporadic, as she has been moved at least nine times in less than four years of life. Despite K.O.'s love for her child, "our consideration must center on whether the child will be disadvantaged by termination." *D.W.*, 791 N.W.2d at 709. We do not find that termination of her mother's parental rights would be detrimental to S.O. based on the parent-child relationship.

As for her father, his arguments in support of this exception center around his suitable housing with his father and successful efforts at sobriety, as well as his bond with S.O. and participation in services. J.H. Jr. also points out that S.O. was briefly placed with him. However, we note that S.O. was never actually placed in his direct care due to his incarceration. Moreover, the parent bears the burden to prove the applicability of an exception to termination. *A.S.*, 906 N.W.2d at 476. Here, we do not find the parent-child relationship is so strong that it outweighs the need for termination. S.O. was moved around many times in her young life and beginning to know her father, but we do not find that termination of his parental rights would be detrimental based on their relationship. Accordingly, we find this exception will not save the father's parental rights.

### IV. Disposition.

Having found the statutory grounds satisfied for each parent, the best interests of the child considered, and a lack of applicable exceptions, we affirm termination of the mother's and father's parental rights.

**AFFIRMED ON BOTH APPEALS.**